Good morning, Your Honor. Jonathan Dunn with the Sedgwick Firm on behalf of Appellants Axtar and P.W. Stephens. I want to start off the argument with a lesson that I learned when I first started practicing law. When I first started practicing law, my first job was with a surety bonding company. And my employer at the time, the senior person at the surety company, told me the first thing that I need to do when analyzing the rights and liabilities of the surety is to read the bond form and construe the bond form. I really think that the primary error in the district court in this case is that it leaped directly out of the bond form and into the subcontract and did not follow the conditions of the bond form and the rights and the obligations of the surety under applicable surety law. For instance, on page 30 and 31 of the findings and fact, after erroneously applying the Muncie Trust case, which I'll talk about later, the district court reasoned, and I'm quoting here, Axtar also argues that even if BHI is entitled to withhold certain portions of the funds under its contract with PWS, BHI is not entitled to withhold funds to offset damages that accrue subsequent to fiscal year 2001, period. This is where the leap of logic comes in next. Quote, since Axtar's rights are only equal to those of PWS, it is also bound by the BHI-PWS contract provision SC15, Exhibit 102. SC15 allows BHI to set off all amounts it withholds from a subcontractor against all damages it sustains when a subcontractor defaults. Moreover, pursuant to GC40 of the BHI-PWS subcontract, PWS is bound to indemnify BHI against any damages, liabilities, or legal costs caused by its default. Based on these provisions, and I'm going to skip part of the quote, BHI is entitled to priority over Axtar to offset PWS's withheld contract earnings and retainage, totaling $1.1 million against the entire damage claim. I really think that's the crux of the problem there. It ignores the conditions stated in the performance bond. It ignores applicable principles of subrogation. And it ignores, if you will, the fact that Axtar did not bond the entire obligation of the subcontract. Is there any evidence in the record that Axtar has paid that bill? No. Axtar has not paid the judgment, if that's what you're asking. Has it paid anything? No. Is there a difference between the judgment and any amount that may have been due? Axtar has paid Contractors Equipment Maintenance Company, the original plaintiff in this case, for both work that was done before termination and work that was done post-termination. At the time on July 3rd when Bechtel-Hanford directed Contractors Equipment to perform an additional couple of days to finish its work and to bill Axtar. So I think what you're getting at is... I guess what I'm asking is can Axtar be said to have fully performed its performance bond obligations  The word fully perform its performance bond obligations will have to do with, if you will, the results of this case. To the extent there's a judgment against Axtar that it has to pay, obviously it will have fully performed its performance bond obligations. It fully performed here in the sense that it offered to perform and it asked Bechtel, if you will, to live up to the conditions of the bond. The issue in this case is really did Bechtel live up to the conditions of the bond. What do you mean by offered to perform? The record shows that Axtar offered to arrange for the performance of the project at the time that Bechtel terminated PWS. Was there a certain period of time that Axtar had to say it was going to take over performance? Well, that was the finding of the district court, which I think is wrong. The finding of the district court said that Axtar had to make that offer within the cure period. Again, that's mixing apples and oranges. The bond says that upon default, after a cure period, et cetera, but upon default, Axtar will perform provided these conditions are met. Bechtel didn't give it that opportunity. Bechtel hit a cure notice, which, again, comes under the subcontract while PWS is still out on the job performing, and then terminated and then two days later told Axtar that it had already terminated and the cure period was expired and therefore under the terms of the bond, how much time did Axtar have to indicate that it would perform? There's no time limit under the bond. Months later it could say, well, now we're going to perform. Well, performance, as the cases show, can come in numerous ways, and that's where I think maybe there's some confusion here. Axtar would have a right to perform in one of several ways, to pay for the cost of performing the rest of the job, less the contract funds that were dedicated for that year, to arrange, if you will, under a takeover agreement to actually physically take over the work and do it themselves or cause other contractors to do it themselves, or to simply pay an amount up front that they felt covered all the damages. So performance is a very broad word under this bond. If you look at the terms of the bond, all Axtar had to do to perform was to pay, and in this instance the only damage, if you will, the only actual damage that Bechtel sustained that wasn't subject to a condition of the bond was paid for by Axtar, and that is the claim of contractors' equipment for the several days of work that it did after the termination of PWS. There was nothing else it had to do? It did not have to. If the court's wondering did it have to physically go out and start the work, no, it did not. And the bond's terms were very clear. It paid everything that was due to indemnify or, you know, to satisfy Bechtel? Subject to the conditions of the bond, yes. Axtar has performed. And what I mean by that is subject to the conditions of the bond. If you look at the particular bond form. When you say it's performed, what has Axtar done? Axtar has paid the bond claims that were presented to it, and Axtar. . . How much? Well, the record shows and our brief shows some $600,000. There was actually more than that, which is part of the underlying record, but in this case I think all we're asking in terms of our subrogation right is the $630,000 that was paid to contractors equipment maintenance company. And I think what's important here, which the district court found factually but did not address in terms of this being a performance bond case, is found on findings of fact page 5, and it's excerpts of the records page 91. What you'll see is lines 1 through 5. The district court found that when PWS was terminated, BHI directed contractors equipment to stop its work performance. Then on July 3, 2001, which is several days after termination, after the June 28, 2001 termination of PWS for default, BHI contacted contractors equipment maintenance company, directing it to complete the final two days of its work on the project, and Bill Axtar, PWS's bonding company, for costs incurred. This work was completed under the supervision of PWS's former project manager. So in terms of this issue in this case, is the performance bond an issue? I would submit it is in many respects, not only from the liability that will result if the district court's decision is upheld, but from the actual payment that Axtar made to contractors equipment company based on the several days of post-termination performance. Is it your position that Bechtel acted too quickly in retaining CME or directing CME contractors equipment? Well, the original position that was taken at the trial court level was that a condition of Axtar's payment to contractors equipment was that Bechtel Hanford used the funds that it was withholding, the $1.1 million, to discharge that claim, to pay it over to contractors equipment. That position was rejected, as the court probably knows from the readings of the record, based on the Watson case and the pay-as-paid provisions. Not necessarily on the bond. Axtar argued that the bond's conditions itself required Bechtel Hanford to do that. But the court found that the riders, the performance bond rider and the annual performance bond rider only related to the performance bond, which is contrary to the testimony of the intentions of the person who wrote the bond, but nonetheless is a factual finding that we're not disputing on appeal. Does that answer this Court's question? All those. So in other words, I guess it's your position that you, once there was the default and once you had notice of the default, you could perform at any reasonable time, I guess, thereafter. Correct. Correct. And they could perform in a number of different ways. I'm not necessarily saying that Bechtel Hanford had to wait for that performance. They might have gotten started. They might have done some time of material work. They might have started to make arrangements themselves. But I do believe Axtar had the right to pick up, perform, and perform by paying or perform by arranging the work. And I don't think that that's really the issue in this case, but I will submit that that is the position that I've taken many times on behalf of sureties. What would be the amount of the payment that Axtar would have to make? If it had paid up front, that's where this rub comes in. There was sufficient money available and withheld by Bechtel Hanford so that the conditions of the bond had to first be met. And the conditions of the bond could not be met by Bechtel Hanford because the condition was that that money be applied towards the cost of performing during that fiscal year, 2001. And that's where the big mistake of the district court comes in. They jump right past the bond form. They don't at all discuss that condition. And they found that Bechtel, that Axtar had the same rights as PWS. They ignored entirely the fact that Bechtel should have paid someone else to do the work and never come to you is what you're saying. What I'm saying is Bechtel should have applied that $417,000 that they incurred in performance costs on fiscal year 2001 to the $1.1 million that they held. And they would have had a surplus. They would have had an extra $750,000, $700,000. Out of that $700,000, what we're also appealing is the limit of the subrogation rights that the district court found as to Axtar's payments to contractors' equipment. Axtar maintained that it subrogated based on its payment to contractors' equipment for that $600,000. So what we're asking is that in terms of a reversal and a remand, on remand the district court would actually award Axtar the $600,000 that Bechtel held because that was the term of the bonded agreement. And that's set forth in the bonds. And it also arises out of subrogation rights pursuant to the payment model. So if they would have paid it, then what you're saying is your duty to perform never would have been triggered? Correct. That was what was argued down below. But then why do you have a bond when you have someone like what you call it, PWS? Why do we have a bond? The bond is, if you will, the financial security that guarantees that PWS will not cause the damages. Now, that doesn't relieve Bechtel Hanford of having to exercise reasonable care to mitigate damages. But that's not really what this case is about. From a surety's perspective, if it's done a good job underwriting a particular risk, there would never be a loss even if the contractor defaulted because there's enough funds in the particular job that the surety underwrote to take care and cover all the costs that it takes to perform that job. That is the bargain that an owner or an obligee wants. That's the ideal situation is that they let a job out to bid. The bid comes back for a price which they accept, and the price that they accept and agree to pay covers all the costs that it takes to do the job. That's what we're talking about here. So you're saying they got a windfall? I am saying Bechtel Hanford got a windfall. But what's Bechtel Hanford's obligation to the Department of Energy in respect to this? Well, Bechtel Hanford sets forth that their obligation is to pursue all avenues of recovery and that their obligation, if they're audited, may at some point be to reimburse. Because that money that you're talking about is actually DOE's money, right? The money that was paid to Bechtel Hanford was DOE's money. It's now Bechtel Hanford's. No, it's not like that. It's in their hands. Well, yes, it's theirs to use that to pay, but it's not exactly the same as it's their money because they're saying they have to pay DOE back if they don't get this money from the surety, right? What they're saying is they may have to pay DOE back, not if they don't get this money from the surety, but if they do get this money from the surety, they may have to pay. Well, I don't think DOE would just be giving you $400,000 for nothing, right? No, they had a cost-plus arrangement with Bechtel Hanford, and under the cost-plus arrangement, part of the risk that DOE and Bechtel Hanford agreed was not on subcontractor defaults. In other words, there's no provision in the Bechtel Hanford agreement with DOE that says if a contractor defaults and Bechtel Hanford incurs damages as a result, that that's Bechtel Hanford's risk. There's no provision in there that says they cannot then apply for reimbursement. In fact, the opposite is true. They still get reimbursed if a subcontractor defaults. So what are the excess charges because of what PWS did? Well, if you simply look at PWS, which is not the position I'm here to espouse, the excess charges are the damages that, or I'm saying the several hundred thousand dollars that was awarded in a judgment. But I don't think you can look at PWS in and of itself because the subcontract spans several years, and the bonded risk that ActSTAR had was simply for that fiscal year 2001. I would like to reserve some time for this. Just one quick question. You were mentioning a condition of the bond that made the use of the retained earnings a condition preceding. What section of the bond is that? In particular, it's the performance bond rider. It's sections, paragraphs four and five, and the annual performance bond rider, excuse me, now paragraph three. Those three provisions read together make it very clear that it is a condition for Bechtel Hanford to recover that it apply all subcontract balance towards the fiscal year 2001 cost to perform. That wasn't done, and it wasn't considered, and it was thrown out by the district court casually. I'll reserve my remaining time. Okay, that's fine. Thank you. Good morning. My name is Marissa Vavon, and I'm here representing the appellee Bechtel Hanford. I think that the appellant does an excellent job of trying to confuse the court by blurring the distinctions between the two different bonds that were issued by ActSTAR in this case, the performance bond and the payment bond. On the first day of trial, ActSTAR finally performed on the payment bond by paying contractors' equipment maintenance company. To this day, ActSTAR has still not performed on the performance bond. Segregation is standing in the shoes of another party after you fulfill the obligations that are owed to that party. ActSTAR has done that with contractors' equipment. By paying on the payment bond, it stands in the shoes of its principal, and it stands in the shoes of the labor supplier, in this case, contractors' equipment. ActSTAR still, though, has never performed the obligations that it owes to Bechtel Hanford. Under the Miller Act, Bechtel in this situation, in effect, is the agent of the Department of Energy, is the government for Miller Act bond purposes. It is the obligee on the bond. It was required to obtain from its subcontractors a performance bond, guaranteeing the performance in case that their subcontractors are in default, so that if the subcontractor defaults, the government in this instance will not be the one left holding the bag here, that they can then look to the surety who is in the risk-taking business to actually pay for that default. Here, P.W. Stevens defaulted. As the court found, from April 2000 through June of 2001, Bechtel received complaint upon complaint about P.W. Stevens and its financial instability, its inability to perform. It issued a notice to CURE after receiving the IRS levies that commanded Bechtel to withhold any amounts payable to P.W. Stevens as a result of their failure to pay their taxes. Notice to CURE was sent. P.W. Stevens was silent. ActSTAR was silent. No one came up and said, hey, I'm going to fund P.W. Stevens' performance, or here's another subcontractor to perform this work. That did not occur. After the notice of default was issued, ActSTAR did appear. First it argued it had a right to the contract balance. Well, as a practical matter, when the IRS did this, then P.W. Stevens wouldn't be paying their people, and so then the job would just, you know, what is that going to happen? It would be the question of how is P.W. Stevens going to perform if Bechtel is not allowed to pay it because the IRS is instructing it not to pay P.W. Stevens. That is why the notice of CURE was issued. Resolve your problems with the IRS. Give us some proof of your financial stability. They didn't do so. They were completely silent during the entire CURE period. ActSTAR comes in after the subcontract was terminated and says, I may have somebody that can perform this job. We have to keep in mind that this involves work out at Hanford. This is governed by a tri-party agreement between the Environmental Protection Agency, the Department of Energy, and the State of Washington. Well, they seem to be saying something at that point, though, that, okay, if you have the money, so since you weren't going to pay PWS, since you weren't going to pay them, that you already had the money to pay someone else, so what's the problem? Well, that's what we use the money for. That is what we have used that $1.1 million. We are not just putting it in our pocket and asking ActSTAR to pay us on top of that. What we are doing is putting it in our pocket and actually paying for the replacement, the interim replacement contractor, and then the formerly recompeted replacement contractor. That money is being used for that work. It just costs more, and that's why we look to ActSTAR under the performance bond to cover the excess costs to complete this work. So you're not asking for anything but the excess? Correct. There's nothing that is being asked for other than the extra cost to complete the P.W. Stevens scope of work. It costs more to have a replacement contractor come in and do it. It costs more to formally recompete the contract because they were only able to have an interim replacement contractor for a short period while we formally recompeted. This is what we have to do under. Except you're not using the amount that's retained to be paid to PWS, are you? Absolutely. Absolutely we are. Our damages totaled approximately $1.4 million, a little less. We are taking the $1.1 million we are holding, reducing that. So that's why the ultimate judgment against ActSTAR in this case was about $282,000 plus fees plus interest. That is all that Bechtel is seeking to recover here and to recover on behalf of the Department of Energy. The district court did find, and absolutely this is the case, that Bechtel is in this case to recover the money expended by the Department of Energy. It's a cost-reimbursable contract, but Bechtel has a contractual obligation to pursue P.W. Stevens, to pursue ActSTAR, to recover these extra costs for the government. If it does not do so, those costs can be disallowed under their contract. They will be disallowed under the contract, and Bechtel will, and Bechtel has to provide those monies back to the Department of Energy. There's no question of this. The district court did find this as well. ActSTAR's attempts to confuse the issue by blurring the distinction between a performance bond surety and a performing payment bond surety really shouldn't confuse this court. The line of cases cited by ActSTAR in which the surety's rights are greater than the government or where the surety stands in the shoes of the government, in each of those cases the surety stepped in, either funded the work or they actually performed the work by providing their own replacement contractor. Well, counsel said that Bechtel didn't give them sufficient time. As I said, this is a – we are bound by our triparty agreement and the milestones. ActSTAR did not attempt during the cure period at all to even contact Bechtel. After it – after the cure period, after the contract was in fact terminated, Bechtel and the district court very much realized this, and the evidence reflected this at trial, that Bechtel had to move immediately to find an interim replacement contractor. Even for the period of time that it would have taken to recompete the scope of work, you know, about a two-month period, the work couldn't stop for that period of time. They had to find somebody that was out on site that can continue the performance. And the district court found that Bechtel did everything that it was in its power to mitigate its damages to get that work done or else it could have been subjected to the very severe triparty agreement penalties if those milestones were not met. Was the cure period found in the bond or in the subcontract? Subcontract. What is it if you look to the bond? Pardon me? What's the obligation under the bond, the performance bond? The obligation under the bond says that the surety has no responsibility or obligation to perform, that it just has the obligation to pay for excess costs to complete. There's no other limitation in the bond with respect to performance. And the district court did find that in its finding of facts as well. Just briefly going forward to the argument that ACSTAR makes with respect to the Department of Energy cost reimbursement, cost reimbursable contract, the district court in our case applied the collateral source rule. Washington courts have contemplated certainly applying this rule by the number of cases that we cite in our brief in which they refer to both wrongdoers and contract breachers. In cases cited by ACSTAR, the only reason the courts chose not to apply the collateral source rule in contract cases was because they do not want in a contract setting for there to be a windfall or a double recovery. That doesn't exist in this case. Also, under FRP 17A, Bechtel is a real party in interest here for the Department of Energy. That contract between Bechtel and P.W. Stevens certainly was for the benefit of the Department of Energy. This argument was raised below. ACSTAR claims it wasn't raised below in the lower court. That's not true. It was raised in the trial brief and in response to ACSTAR's motions for summary judgment as well. Lastly, with respect to fees and interest, contracts certainly dictate Bechtel's recovery of fees and interest in this case. Look to the U.S. Maddox case. Look to the Benz Contractors case. They specifically call for the recovery of both fees and interest, under performance bond surety, that they can recover both fees and interest in this case. Now, I see the issue as a little bit different. I think in one sentence you contend that GC40 also requires the court to award attorneys' fees and costs on appeal. Correct. We do make that allegation. Well, you know, the way that I'm sort of seeing it is the way to get there is, well, you know, we could award fees under Federal Rule of Appellate Procedure 38 if you determine the appeal to be frivolous, but I'm having a hard time finding it to be frivolous when we have to essentially, in order to get there, we have to reconcile, I think, that ACTR saying that the language of the Bechtel-Stevens contract cannot override the bonds language regarding as to attorneys' fees, nor can it do so with regard to prejudgment interest. So, I mean, we've got to reconcile two sections in order to get where you want us to get. I'm having a hard time seeing how that would be frivolous. Well, I look at it as under the Benz case in which the bond itself incorporated the subcontract, and on that basis alone the court awarded attorneys' fees and interest. Also with the interest, ACTR makes much of the notion of liquidated damages. There was no liquidated. That's on the attorneys' fees that the court awarded, though, right? Oh, correct. But on appeal, I see that issue separately. Okay. And you don't talk much about that in your brief. You just ask for it. We ask for it under the contract with P.W. Stevens and Bechtel-Stevens. The same basis on which the district court awarded. Correct. I'll reserve the rest of my time for that. Thank you. I think, actually, our rules require that if you're going to ask for fees on appeal, you do it after we've decided. And that's why it was just a very short little request. We filed a separate motion. Just real quick, I'd like to talk about the windfall that Bechtel-Hanford got. They did get a windfall here vis-à-vis the bonded obligation, vis-à-vis the deal they struck with ACTR. The deal they struck with ACTR is that they would apply the contract funds towards fiscal year 2001. They didn't do that. They applied it towards something else. That's their windfall. That wasn't part of ACTR's risk. The second thing I want to do is just to see. That is unclear to me. Post and counsel said that it was applied, the retained earnings were applied so that the ACTR didn't owe any more than the 200 and some odd thousand dollars. So wasn't it applied? No. It was only partially applied. They incurred $400,000 in performance costs in fiscal year 2001. And they only partially, they had $1.1 million in their hand. The only part that they applied is the difference between the judgment, which was $230,000, and the fiscal year 2001 performance cost, which was $400,000. They should have applied the entirety of the $1.1 million to the $400,000 first. That is an express condition in the bond. That's the deal that Beckle Hanford struck with ACTR. And that's the biggest problem with the district court's decision. But I also want to talk for just a moment about Muncie Trust because Muncie Trust was cited and relied upon by the district court. And Muncie Trust is a very controversial decision as far as the surety industry is concerned. And I think there are several ways to distinguish Muncie Trust and then flat out argue that it's wrong and it ought to be restricted to its holding. In particular, Muncie Trust, in Muncie Trust, I would like the court to notice, that solely involved a payment bond claim. Now, Beckle Hanford says this solely involves a payment bond case. But that's not true. They have a cross-claim against the performance bond, and they sit here today with a judgment, subject to appeal, against the performance bond. Muncie Trust did not involve those facts at all. The government never sought a viability from the performance bond in Muncie Trust. In addition, what's important here is that Beckle Hanford is not the government. They don't have sovereign immunity. There is an equitable lien that arises in favor of contractors' equipment and other persons that provide labor and material to the project that they can enforce against Beckle. That issue was just dealt with, or the district court relied solely on Muncie Trust and did not address that issue. And then the final issue is what we raised. There was several days of performance by contractors' equipment that ActSTAR paid, and it is a performance bond surety in that context as well. I can't address the attorney's fee provision because I don't think the bond form, if you look at that, as opposed to the contract, covers attorney's fees. But that's in the brief, and I trust your honor. It does say amounts justly due, however, and that's what the district court was relying on. No, it does not. It does not say amounts justly due. The performance bond does not say amounts justly due. It refers to the subcontract, and then it says very explicitly what damages it will cover. The actual cost of performing the work in fiscal year 2001 minus the amounts that are payable to P.W. Stevens under the subcontract. That's all it covers. It actually excludes consequential damages. It goes on to exclude that it says it's not an insurance policy. It's not intended to in any way capture all the liabilities of the subcontract. It's very explicit, and I'm actually very impressed as a surety practitioner, the degree to which the surety intended to exclude other types of damages. Now, the sums justly due, that's a statutory reference to the payment bond. The payment bond under the Miller Act covers sums justly due, and Your Honors may remember there was a Watson case versus Westar Construction, which I believe is an opinion authored by the Ninth Circuit, which said that the subcontract cannot write out the terms under the Miller Act in the bond. Well, in this case, ironically, the Westar opinion was cited to do exactly that. It was cited for the purposes of writing out the terms of the performance bond, which do not cover all of the types of damages which PWS is liable to Bechtel for. It only covers the actual cost of performing the work. So I think that's very important here that we don't confuse the claim that Bechtel has made on the performance bond with sums that are justly due and entitled to payment bond claimants on a payment bond. Okay. Thank you. The matter will be submitted and will be adjourned until tomorrow morning. Thank you.
judges: Hug, Paez, Callahan